IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

S.C., by her mother and next friend, K.G.

    Plaintiff,

v.

Lincoln County School District,

    Defendant.

_____

Civ. No. 6:20-cv-02277-MC

OPINION AND ORDER

**MCSHANE, Judge**:

Pending before the Court is Plaintiff's Motion for a Stay-Put Order or, in the alternative, a Preliminary Injunction. ECF No. 6. The Court heard oral arguments on January 27, 2021 and requested supplemental briefing. As discussed below, Plaintiff's motion for a stay put order is DENIED.

BACKGROUND

Plaintiff is a 14-year-old girl who attends school in the Defendant Lincoln County School District. Pl.'s Mot. ¶ 5-6, ECF No. 6; Pl.'s Mot. 12. Plaintiff has Prader-Willi Syndrome (PWS) which is a disability under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq* (IDEA). Compl. ¶ 5, ECF No. 1. PWS is a genetic condition disrupting a person's appetite control. In severe cases, such as Plaintiff's, it results in verbal and physical aggression, as well as extensive food seeking thoughts that lead to poor impulse control and behavioral issues. Compl.

1

¶¶ 17-20. Plaintiff suffers from extreme anxiety around food that is best controlled with consistency and rigid routines. Compl. Ex. A ¶¶ 8, 11.[1] Total food security (TFS) is a system used to treat people with PWS in which food is only present during mealtimes and is otherwise locked up and out of sight at all times. Compl. Ex. A ¶ 14. TFS is recommended by Dr. McTighe, a designated expert in PWS, for individuals such as Plaintiff who are on the severe end of the PWS spectrum. Ex. A ¶ 15.

Plaintiff has struggled with behavioral problems throughout her education in the Lincoln County School District. In response, Defendant created Individualized Education Programs (IEPs) and Behavior Plans (BPs) for the student beginning in the 2015-2016 school year. Compl. Ex. A ¶¶ 20, 25. The food protocol that was implemented in 2016 restricted food access in the Structured Learning Center. Compl.[2] Ex. A ¶ 23. In 2018, the District created a written food protocol noting Plaintiff's PWS and instructing teachers on how to respond if food was found in their classrooms. Compl. Ex. A ¶ 51. Dr. McTighe felt at the time that the 2018 food protocol was not restrictive enough as it did not prohibit food in Plaintiff's classrooms. Compl. Ex. A ¶ 53. Plaintiff's mother also emphasized the importance of TFS to the IEP team. Compl. Ex. A ¶ 50. Despite this, the school continued reward-based food events for its general population of students and Plaintiff was exposed to food outside of mealtimes. The December 2018 IEP indicated that Plaintiff was falling behind in writing and math because she was often sleeping in class; usually after issues with morning snack. Compl. Ex. A ¶ 137.

In September 2019, Plaintiff's mother again contacted Defendant about limiting Plaintiff's exposure to food: (1) during breakfast; (2) as a reward system for other students; and (3) during a class art project. Compl. Ex. A ¶¶ 68, 72-73. Plaintiff had several behavioral

---

[1] Ex. A is the 68-page order the Administrative Law Judge entered on December 22, 2020.
[2] Over the years, Plaintiff spent more time in the Structured Learning Center and less time in her classrooms.

2

responses during this time, including harming another student and wiping feces in a school room and on a staff member. Compl. Ex. A ¶¶ 74, 77, 84.

In response to these behaviors, Plaintiff's mother suggested placement at the Latham Center. Compl. Ex. A ¶ 69. Latham Center is a residential school in Massachusetts specializing in PWS. Compl. Ex. A ¶ 21. Latham offers TFS. Compl. Ex. A ¶ 21. Plaintiff's mother expressed concern about Plaintiff's repeated complaints about anxiety in school around food. Plaintiff reported being distracted by food and frequently used the bathroom as a space to calm down. Plaintiff also stole food from other students and had more incidents of smearing feces. Compl. Ex. A ¶¶ 77, 82.

The IEP team updated the IEP in December of 2019 and Plaintiff's mother requested that it include TFS. Compl. Ex. A ¶ 87. Plaintiff continued to nap, miss class, and struggle in general education classes around incidents of food exposure. Defendant conducted a Functional Behavior Assessment (FBA) that concluded that food triggered frustration for the student in challenging classes; a situation which would be especially difficult for the Defendant to control around the holidays. Compl. Ex. A ¶¶ 99-100. The FBA recommended a behavioral plan or different schedule and did not recommend that the school implement TFS. Compl. Ex. A ¶ 100. Plaintiff's expert on the development of FBAs, Dr. Quirk, reviewed the FBA and found it to be flawed. Compl. Ex. A ¶¶ 104-106. In Dr. Quirk's opinion, the District's evaluator lacked a foundational understanding of PWS and was therefore unable to properly examine Plaintiff and the food-related behavior issues. Compl. Ex. A ¶ 106.

In January 2020, Plaintiff's mother again requested the school adopt a TFS environment and asked that school staff attend training by Dr. McTighe. Compl. Ex. A ¶ 110. The IEP team met to amend Plaintiff's IEP based on the new FBA. Compl. Ex. A ¶ 112. Dr. McTighe

participated in the meetings, providing contextual information about PWS to the IEP team. Compl. Ex. A ¶ 112. District staff received PWS specific training between August and October 2020. Compl. Ex. A ¶ 114. Dr. McTighe, who led the training, "provided both general information about PWS and specific information about Student including the role anxiety played in Student's behavior, positive supports, behavior supports, Student's triggers, and food security needs." Compl. Ex. A ¶ 212.

In January 2020, in response to Plaintiff's escalating behaviors, her placement was changed to the Structured Learning Center for most of the day, and Plaintiff stopped participating in general education classes. Compl. Ex. A ¶ 116. Plaintiff was hospitalized in late February for mental health issues. Compl. Ex. A ¶ 127. During that time, Plaintiff was given new medication and stabilized. Compl. Ex. A ¶ 127. On March 13, 2020, the District closed all schools due to the pandemic.[3] Compl. Ex. A ¶ 130.

On May 21, 2020, Plaintiff filed a request for a due process hearing. In October 2020, the parties appeared before an ALJ for a hearing lasting over 50 hours. Compl. ¶ 16. On December 22, 2020, the ALJ issued a 70-page opinion. Compl. Ex. A. As relevant here, the issue before the ALJ was whether the Defendant denied Plaintiff a FAPE in violation of the IDEA between May 21, 2018 and May 21, 2020.[4] Compl. Ex. A 3.

An updated IEP was created on September 18, 2020. This IEP, and whether it puts the District in compliance with the ALJ's order, is central to the parties' dispute here. Notes from

---

[3] "During distance learning there has been no noted behavioral incidences. From April to June [2020] there were seven group meets and Student attended all with no problems." Compl. Ex. A. ¶ 153.

[4] The ALJ made several references to the fact that she was limited in determining if the District denied Plaintiff a FAPE only up to May 21, 2020. For example, Plaintiff alleged the District denied ESY during the Summer of 2020. The ALJ noted "the 2020 summer occurred after Parent filed the current due process complaint and this is not within the period at issue. I therefore do not have authority to address any alleged failure to provide ESY during the summer of 2020." Compl. Ex A 54.

4

May and June 2020 IEP meetings indicate the District lacked clarity on the food security protocol but "decided to develop a food security protocol to show Parent what the District could provide." Compl. Ex. A ¶ 196. The September 2020 IEP contained a food safety protocol:

> The protocol stated that Student would enter the classroom from an outside door, that Student would be met at arrival by an adult who received Student's meals from the parent. The protocol stated that Student would eat only the food provided by the parent, that Student would need to eat in a separate location from his/her peers with an adult who was not eating, and that after meals, the trash would be immediately removed from the room. The protocol stated that food should not be used as a reward or instruction in the classrooms that Student attends, that the classrooms that Student attends must have locks on the cabinets, that students in classes that Student attends should be pre-taught that no food is allowed in the classroom, that students will be reminded they cannot bring food into the SLC, that lessons will not include food topics, that events in the classroom will not involve food, and that staff will work with the parent to determine food access at the event if there is an off-campus activity. The protocol stated that if Student obtained food that was not provided by the parent, the staff should not punish him/her and that parent should be notified. It also provided that if Student was provided a small amount of food, that Student should be allowed to eat the item but that if it was a large amount that it must be taken from Student. It also provided that if food was taken from Student, she/he might exhibit problem behavior and that staff should follow Student's BP, and that staff should not debrief the situation. The protocol also addressed how food should be addressed in distance learning situations.

Compl. Ex. A ¶ 199.[5]

> The ALJ described the September 2020 IEP's inclusion of aids and services:
>
> The District indicated that a behavioral plan would be implemented all day at school, that a break area would be available, that there would be daily communication between the school and home, that adult support would be provided by individuals who were trained in Student's behavior plan and appropriate PWS interventions and that the support would be provided at all school sites. The IEP also provided that class notes would be given. *The service section of the IEP also indicated that food security would occur in all in-school environments school wide, that the District would develop a food plan for each activity outside of school, and that the food safety protocol would be implemented.* The District also listed a support of a three hour PWS training for staff and ongoing consultation.

---

[5] The earlier IEPs lacked food safety protocols.

5

Compl. Ex. A ¶ 174 (internal citations omitted).

In contrast to the January 2020 IEP, the September 2020 IEP increased Plaintiff's Specially Designed Instruction. For example, the September 2020 IEP contained five times the amount of Math instruction by a special education teacher. Compl. Ex. A ¶¶ 179, 181. Additionally, while the January 2020 IEP contained no weekly minutes of behavior-related instruction, the September 2020 IEP contained 50 weekly minutes each of behavior and self-care skills. Compl. Ex. A ¶¶ 179, 181.

Defendant also created a new behavior plan indicating that exposure to food may lead to behavioral issues for Plaintiff with guidance for staff on how to address those concerns. Compl. Ex. A ¶ 200.

Plaintiff is currently at the Stabilization and Crisis Unit outside of the Lincoln County School District, and Defendant is providing distance learning services within the bounds of the most recent IEP. Def.'s Mot. ¶ 7-8, ECF No. 11. Plaintiff is still receiving case management and instruction from Defendant and is making educational progress. Def.'s Mot. ¶ 9. The ALJ order requires Defendant pay the cost of the student to attend Latham "until the District provides TFS in school-wide setting along with an IEP which addresses all the inadequacies identified in this order or the next annual IEP which appears to be September 2021." Compl. Ex. A 76 (footnote stating TFS as used by Dr. McTighe and the PWS Association omitted).

## DISCUSSION

The IDEA was established to guarantee the right to a free appropriate public education (FAPE) to all children with disabilities. 20 U.S.C. § 1400(d)(1)(A). A FAPE is a special education provided at public expense in line with an IEP. 20 U.S.C. § 1401(9). The IDEA requires that an eligible child receive a regularly updated IEP with measurable goals tailored to the child, created by the IEP "team" consisting of, at the minimum, a parent of the child, a

regular education teacher, a special education teacher, a representative of the local educational agency, an expert regarding the child, and occasionally the child. 20 U.S.C. § 1414(d).

Any party can raise a complaint regarding the education of the child, including the FAPE provision. 20 U.S.C. § 1415(b)(6). Once a complaint is received, both parties have an opportunity to have a hearing in front of an agency determined by state law, and that agency's decision is final unless a party appeals. 20 U.S.C. §§ 1415(f)(1)(A), 1415(i)(1)(A). During any proceedings under § 1415, IDEA requires the child remain or "stay put" in the current educational placement, unless the state and the parents agree otherwise. 20 U.S.C. § 1415(j).

Plaintiff moves for such a "stay put" order, arguing the Court should issue an order requiring the District to pay for Plaintiff to attend the Latham Center during the pendency of any appeals.[6] ECF No. 6. As noted, the "stay put" provision provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . ." 20 U.S.C. § 1415(j). Stated differently, the stay put provision "requires the educational agency to maintain a disabled child's educational program until any placement dispute between the agency and the child's parents is resolved." *Johnson v. Special Educ. Hearing Off., State of Cal.*, 287 F.3d 1176, 1179 (9th Cir. 2002).

"Although the IDEA does not define 'current educational placement,' courts have interpreted this phrase to mean 'the placement described in the child's most recently implemented IEP.'" *Ravenswood City Sch. Dist. v. J.S.*, 2010 WL 3807061 at *3 (N.D. Ca.) (quoting *Johnson*, 287 F.3d at 1180). However, "If the hearing officer in a due process hearing

---

[6] In the alternative, Plaintiff argues she is entitled to relief under 42 U.S.C. § 1983. The Ninth Circuit concluded, however, that "Congress did not intend § 1983 to be available to remedy violations of the IDEA[.]" *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007) (quoting *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 803 (3d. Cir. 2007)).

7

conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for the purpose of" the stay put provision. 34 C.F.R. § 300.518(d). *See also Burlington v. Mass. Dept. of Ed.*, 471 U.S. 359, 372-73 (1985) (noting decision in parent's favor during due process administrative hearings "would seem to constitute agreement by the State to the change in placement.").

"The stay-put provisions strive to ensure the child is not treated as a ping-pong ball, ricocheting between placements with each new ruling in the dispute between the parents and school. Unlike the usual standards for awarding interim relief, the court does not even inquire whether the moving party is likely to prevail in this action." *Ashland Sch. Dist. v. V.M.*, 494 F.Supp.2d 1180, 1182 (D. Or. 2007). Instead, "A motion for stay put functions as an 'automatic' preliminary injunction, meaning that the moving party need not show the traditionally required factors (*e.g.* irreparable harm) in order to obtain preliminary relief." *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1037 (citing *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996)).

In *Rocklin*, the court discussed Congress's intent in enacting the statute:

> The fact that the stay put provision requires no specific showing on the part of the moving party, and no balancing of equities by the court, evidences Congress's sense that there is a heightened risk of irreparable harm inherent in the premature removal of a disabled child to a potentially inappropriate educational setting. In light of this risk, the stay put provision acts as a powerful protective measure to prevent disruption of the child's education throughout the dispute process.

*Id.*

As relevant here, the issue before the ALJ was whether Defendant denied Plaintiff a FAPE in violation of the IDEA "between May 21, 2018 and May 21, 2020." Compl. Ex. A 3. The ALJ answered that question in the affirmative. Compl. Ex. A 39. Regarding Plaintiff's

placement, the ALJ concluded that, "as a practical matter, Student's placement changed after Student's disrobing incident on January 14, 2020. Starting on January 15, 2020, Student was placed into the SLC full-time." Compl. Ex. A 56. The ALJ later concluded, "Based upon this record, Parent has established that a placement at Latham Center is reasonably calculated to enable Student to receive educational benefit and is an appropriate placement for Student." Compl. Ex. A 67. The ALJ ordered:

> The District is to pay the cost of enrolling the Student at the Latham Center, including non-medical care, room and board, for the period commencing on the first day of the winter 2021 semester until the District provides TFS in school-wide setting along with an IEP which addresses all of the inadequacies identified in this order or the next annual IEP which appears to be September 2021.

Compl. Ex. A 68 (internal footnote omitted).

The District argues it is complying with the ALJ's ruling and, based on the September 2020 IEP, in conjunction with the modified Behavior and Food Security Plans, and staff training, it is now providing Plaintiff a FAPE addressing all the inadequacies noted by the ALJ. Def.'s Resp. 2-3. In other words, Defendant argues that "Because [it now provides Plaintiff with an IEP addressing the ALJ's concerns], there is no basis for placement at Latham Center." Def.'s Resp. 2. In response, Plaintiff argues the ALJ implicitly rejected any argument that the September 2020 IEP complies with the ALJ's order.

At oral argument, the Court noted the ALJ's order was a conditional order; i.e., that the District was required to place Plaintiff at Latham Center only until it completed an IEP addressing the deficiencies in the ALJ's order. Transcript of January 27, 2021 Oral Argument, 4; ECF No. 22 (Noting that the order "does seem to me to be somewhat of a conditional order or alternative order . . . from my perspective, it requires the student to be placed at the Latham Center, but then it provides an alternative to that: That if the district provides total food security in a schoolwide setting and a new IEP that addresses the inadequacies outlined in the order, then

9

of course the student would stay in the district."). The Court noted that as neither side appealed the ALJ's order:

> There is no real administrative dispute here. The dispute underlying all of this really is actually a question of what the ALJ meant to say, and I just—I feel like I'm really being asked to review the adequacy of the school district's new plan, which they say meets the needs set forth by the ALJ, but there's been no due-process complaint before the district for me to review.
>
> So I'm concerned about whether this Court has any jurisdiction whatsoever.

Tr. 5.

Plaintiff argued the September 2020 IEP "is the one that was present and litigated in the due-process hearing." Tr. 6. When pressed as to whether the ALJ made any ruling about the September 2020 IEP, Plaintiff stated, "Well, I think by implication she did because of the way she structured her order." Tr. 7. In response to Plaintiff's request for supplemental briefing following the introduction of the transcript into the record, the Court noted:

> Well, I don't know if it's going to change my mind dramatically if there are some just—the ALJ made some random comments about a plan that wasn't, you know, adequately put before her.
>
> I mean, I'm still hung up with the idea that the ALJ's period of—period that was being considered was limited to May 21, 2020, whether I should really take into account some general comments that may have been made about a plan that really hasn't been administratively challenged.
>
> \* \* \* \*
>
> If there is some strong evidence that the ALJ looked at the district and said "Your September 2020 remedy isn't going to cut it; you're going—my ruling is that you have to submit something else," you're in a much better position.
>
> \* \* \* \*
>
> I do agree that if—if literally the order is to read "The student—the district will pay for the cost of enrolling the student at the Latham Center, and the district must provide a total food security in the school-like setting along with an IEP which addresses all the inadequacies identified in this order and is not the September '20 IEP," there is [a] much stronger position to say that there is an order the child is to be placed in the Latham Center.

Tr. 18-20.

The parties then submitted supplemental briefing. Even after going through the voluminous transcript, Plaintiff is unable to point to any explicit finding or conclusion by the ALJ explicitly rejecting the September 2020 IEP as inadequate. Plaintiff is forced to argue merely that the ALJ implicitly concluded that the September 2020 IEP would not provide a FAPE. In the context of the ALJ's lengthy, and rather broad, ruling, this is not enough.

There is no question that evidence regarding the September 2020 IEP was introduced below. Some of this evidence, over Plaintiff's objections, came in as part of the remedy aspect of the hearing. However, it is impossible to state with any degree of certainty, that the ALJ concluded the September 2020 IEP did not substantially address the deficiencies the ALJ pointed out in the previous IEPs at issue in the hearing. The ALJ could have viewed the evidence of events after the statute of limitations (including the September 2020 IEP) not only in regard to the appropriate remedy, but also as to a general contextual history of Plaintiff's varying degrees of symptoms over the years and the District's attempts at providing a FAPE. The ALJ could have viewed the September 2020 IEP in the context of whether the earlier deficiencies were deliberately indifferent, or merely negligent. The ALJ could have viewed the evidence after the relevant time period when determining the extent, if any, of Plaintiff's damages.[7]

That both parties are able to make arguments supporting their interpretation of how the ALJ viewed the September 2020 IEP only goes to show that there is at least a colorable argument that the IEP addresses the ALJ's concerns. There is certainly no strong evidence in the record indicating the ALJ concluded the September 2020 IEP was not an adequate remedy.

---

[7] The ALJ ultimately determined that Plaintiff failed to present sufficient evidence to support compensatory damages. Compl. Ex. A 67.

11

Instead, the ALJ made express findings noting the September 2020 IEP went much further than the earlier IEPs.

The Court again notes that the ALJ specifically limited the determination of whether the District denied Plaintiff a FAPE to the period of May 21, 2018 to May 21, 2020. Compl. Ex. A 3. Additionally, the ALJ determined the District denied Plaintiff a FAPE during the time period in question in part because it failed to provide training regarding PWS and the IEPs lacked behavior and food safety protocols. But as noted above, the September 2020 IEP was created after the District provided training provided by Dr. McTighe. And the September 2020 IEP, unlike the previous IEPs, contained behavior and food safety protocols.[8] Additionally, the ALJ noted that the September 2020 IEP "indicated that food security would occur in all in-school environments school wide, that the District would develop a food plan for each activity outside of school, and that the food safety protocol would be implemented."[9] Compl. Ex. A ¶ 174. The ALJ noted the September 2020 IEP provided for increased specially designed instruction, including five times the previous math instruction, and 100 minutes (instead of zero minutes) of weekly behavior and self-care instruction. Compl. Ex. A ¶¶ 179, 181. In short, the ALJ noted numerous substantial additions in the September 2020 IEP that were absent from the earlier IEPs.

It appears clear that the crux of the disagreement here is actually whether the September 2020 IEP denies Plaintiff a FAPE (and therefore violates the ALJ's order that the District provide a FAPE by correcting the deficiencies the ALJ noted in the earlier IEPs). But as that question was not before the ALJ, and as the ALJ made no ruling that the September 2020 IEP

---

[8] The ALJ devoted over one page of her opinion describing these new plans. Compl. Ex. A. 36-37.
[9] The ALJ described TFS as "a system where food is present only during meal times and that food is locked up and out of sight in all other areas/times. In a school setting, there is no food during instruction, special events, or anywhere in the school building except during meal times in the cafeteria." Compl. Ex. A ¶ 14. The earlier IEPs offered TFS only in the SLC or not at all.

12

would not in fact address the deficiencies, the question is one that must be answered at the administrative level, and not on an expedited basis during an emergency motion for a stay put order before this Court.

## CONCLSION

Plaintiff's motion for a stay put order, ECF No. 6, is DENIED.

IT IS SO ORDERED.

DATED this 22nd day of March, 2021.

/s/ Michael McShane
Michael McShane
United States District Judge

13